UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JAIME SABATER,

                              Plaintiff,

                                                              **REPORT AND**
        -against-                                             **RECOMMENDATION**

CAROLYN W. COLVIN[1], Acting                                  12 Civ. 4594 (KMK)(JCM)
Commissioner, Social Security Administration,

                              Defendant.
-------------------------------------------------------------x

To the Honorable Kenneth M. Karas, United States District Judge:

        Plaintiff Jaime Sabater ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for disability benefits, finding him not

disabled.  Presently before this Court are:  (1) Plaintiff's motion to reverse the Commissioner's

decision and remand solely for the calculation of disability benefits or, in the alternative, vacate

such decision and remand for further consideration by the Commissioner, pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure (Docket No. 10); (2) Plaintiff's motion for attorney's

fees and costs pursuant to 28 U.S.C. § 2412(d) (Docket No. 10); and (3) the Commissioner's

cross-motion for judgment on the pleadings to affirm the Commissioner's decision pursuant to

Rule 12(c) (Docket No. 15).  For the reasons below, I respectfully recommend that Plaintiff's

motions should be denied and that the Commissioner's cross-motion should be granted.

---

[1]  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin, the current Acting
Commissioner of Social Security, has been substituted as the defendant in this action.

## I. BACKGROUND

Plaintiff was born on May 2, 1962. (R. 119). He completed high school and approximately two years of college. (R. 405). From September 1987 through October 2006, he worked as a corrections officer for the New York City Department of Corrections, stationed at Bellevue Hospital Center ("Bellevue"). (R. 406). In May 2005, Plaintiff injured his left shoulder and right knee while attempting to restrain an inmate. (R. 433). He received medical treatment at Bellevue emergency room for these injuries. (R. 181-85). Plaintiff later underwent left shoulder arthroscopic surgery at Mt. Sinai Hospital with Dr. Evan Flatow. (R. 275-77). After his May 2005 accident, Plaintiff was put on light duty and continued to work. (R. 406-07). However, Plaintiff resigned in October 2006 and has not worked in any capacity since that time. (R. 406-07).

On February 16, 2007, Plaintiff filed a disability insurance benefits application, alleging that he became disabled and was unable to work as of October 20, 2006 due to his shoulder and knee injuries. (R. 134-45). The Social Security Administration ("SSA") denied Plaintiff's application on May 8, 2007. (R. 73). Plaintiff appealed the denial, and, on January 20, 2009, Plaintiff testified before Administrative Law Judge ("ALJ") James B. Reap. (R. 40-68). On June 3, 2009, ALJ Reap affirmed the denial of benefits, concluding that Plaintiff was not disabled. (R. 28-39). The Appeals Council denied Plaintiff's request for review on October 19, 2009. (R. 1-3). Thereafter, Plaintiff appealed the SSA's decision by filing an action in the United States District Court for the Southern District of New York, docket number 09 Civ. 10261. The parties agreed to remand the matter for further proceedings by a stipulation that was so-ordered by the Honorable Paul A. Crotty, United States District Judge, on July 2, 2010. (R. 457-58). On September 27, 2011, Plaintiff testified at the remand hearing before ALJ Robert Gonzalez. (R.

401-50).  On October 21, 2011, ALJ Gonzalez issued a written decision, finding that Plaintiff was not disabled from his alleged onset date, October 30, 2006, through his last insured date of December 31, 2010. (R. 380, 389).  This became the Commissioner's final decision on May 10, 2012, when the Appeals Council declined to "assume jurisdiction" of the case. (R. 326). Plaintiff filed the present action on June 12, 2012, contending that the ALJ's decision was not supported by substantial evidence in the record and was based on an error of law.

## A.  Plaintiff's Physicians

Numerous physicians treated Plaintiff.  Those doctors' records became part of the official record reviewed by the ALJ at the remand hearing.

## 1.  Orthopedics & Sports Medicine, P.C.

Dr. Barry Hyman, Dr. Gina Del Savio, Dr. John Uhorchak, Dr. Esteban Cuartas, and Nurse Practitioner Teresa Orton ("NP Orton") all treated Plaintiff at the office of Orthopedics & Sports Medicine, P.C. (R. 844).  Plaintiff sought treatment from Dr. Hyman after being injured in May 2005.  After reviewing an MRI of Plaintiff's left shoulder on June 10, 2005, Dr. Patel diagnosed Plaintiff with "Hill-Sachs deformity of the posterosuperior head of the humerus;" "mild AC [acromioclavicular] joint capsular hypertrophic changes;" "mild subacromial bursitis;" and "an intrasubstance linear tear of the distal supraspinatus tendon without retraction." (R. 251-52).  Dr. Hyman met with Plaintiff "for followup of his MRI of his left shoulder" on June 17, 2005 and recommended that Plaintiff be put on light duty at work and prepare for corrective shoulder surgery. (R. 195).

According to NP Orton's December 2008 report, Plaintiff complained of a pain level of 6 out of 10, but NP Orton noted moderate improvement of his condition with physical therapy. (R. 812).  Plaintiff also reported that he was engaged in low impact activities. (R. 813).  NP Orton

found that Plaintiff's left shoulder had "moderate tenderness;" no edema, crepitus, or weakness; and "decreased strength to external rotation but not to forward flexion against resistance." (R. 814). She further found that Plaintiff's right knee had "good strength without pain to extension and flexion against resistance." (R. 814). NP Orton opined that Plaintiff was fully disabled but in a stable condition. (R. 815).

NP Orton's March 2009 physical examination results were similar to her December 2008 findings, but she opined that Plaintiff's condition was worsening. (R. 816-18). Plaintiff consistently reported his pain level at 5 to 6 out of 10 from March 2009 to January 2011. (R. 812-59). In reports completed by Dr. Hyman, Dr. Del Savio, Dr. Uhorchak, Dr. Cuartas, and NP Orton, from 2009 to 2011, Plaintiff's condition was repeatedly noted as stable, and the physical examination results were similar to the March 2009 results. (R. 816-59). In July 2011, Dr. Hyman and NP Orton noted on a standardized check-box form that Plaintiff was able to lift or carry between 5 and 10 pounds for up to 1/3 of an 8 hour work day and stand or walk for less than 2 hours and sit for less than 6 hours in an 8 hour work day. (R. 1043-44). Dr. Hyman and NP Orton also opined that Plaintiff had limited concentration due to the pain and would require frequent breaks and an average of two or more sick days per month. (R. 1044).

**2. Dr. Evan L. Flatow**

In October 2005, Dr. Evan Flatow performed arthroscopic surgery on Plaintiff's left shoulder. (R. 275-77). Dr. Flatow saw Plaintiff every three months from October 2005 to September 2006. (R. 253). In March 2007, Dr. Flatow opined that Plaintiff's left shoulder suffered a "permanent loss." (R. 254-55). Dr. Flatow opined that Plaintiff should limit weight lifting up to 5 pounds and prescribed Vicodin to be taken every four hours to relieve recurring

pain. (R. 256, 258-59).  Dr. Flatow noted no limitation in Plaintiff's ability to stand, walk, and sit. (R. 259).

### 3. Dr. Marc Appel

Dr. Appel operated on Plaintiff's right knee in 1995. (R. 425).  Plaintiff sought treatment with Dr. Appel and NP Orton from June 2005 to 2007 for the purposes of Workers' Compensation. (R. 203-49, 279-80).  Dr. Appel diagnosed Plaintiff with "rotator cuff tear" and "closed dislocation of shoulder" in June 2005. (R. 249).  A September 2005 right knee MRI showed no abnormality. (R. 250).  Dr. Appel diagnosed Plaintiff with "meniscus tear" and "knee pain" in January 2006. (R. 237).  In September 2006, Dr. Appel recommended that Plaintiff be put on light duty and noted that Plaintiff had a "[p]ermanent total disability from his occupation as a corrections officer." (R. 219).

In November 2006, Dr. Appel reported 4/5 muscular strength in the external rotators, limited ranges of motion with flexion to 110 degrees, abduction to 80 degrees, and external rotation to 40 degrees. (R. 213).  Dr. Appel diagnosed Plaintiff with "[r]otator cuff tendinitis" accompanied with shoulder and knee pain. (R. 213).  In April 2007, Dr. Appel reported that Plaintiff's right knee had "antalgic [m]inimal gait" with 5/5 motor strength; limited active [range of motion] with extension (5 degrees) and flexion (to 100 degrees);" no evidence of Lachman's instability; and no lateral or medial collateral instability. (R. 280).  Dr. Appel also reported that Plaintiff's left shoulder had 4/5 motor strength; limited range of motion "with flexion (to 110 degrees), abduction (to 80 degrees), and external rotation (to 40 degrees);" and intact sensation. (R. 280).  Dr. Appel reiterated that Plaintiff was permanently disabled "for Corrections." (R. 280).

In December 2008, Dr. Appel noted on a standardized check-box form that Plaintiff was able to lift or carry between 5 and 10 pounds for up to 1/3 of an 8 hour work day and stand or walk for less than 2 hours and sit for less than 4 hours in an 8 hour work day. (R. 313). He also noted that Plaintiff had difficulty with concentration and would be in pain during the work day, interfering with his ability to function. He added that Plaintiff would require frequent breaks and two or more sick days per month. (R. 314).

**4. Downtown Physical Medicine & Rehabilitation**

Plaintiff saw Dr. Adam Carter, Dr. Marc Levinson, and Dr. Stephen Levinson at the office of Downtown Physical Medicine & Rehabilitation. (R. 792, 793, 1018). In May 2008, Dr. Carter diagnosed Plaintiff with "[i]nternal derangement of the right knee" and "[s]tatus post surgical repair of left shoulder dislocation," and he prescribed Vicodin and Arthrotec for pain. (R. 792). In August and November 2008, Plaintiff reported that he managed his pain adequately with medication. (R. 794-96). Plaintiff denied any numbness, tingling, or weakness. (R. 794-96).

In March and May of 2008, Dr. Carter opined that Plaintiff had a partial disability. (R. 792-93). In August 2008, Plaintiff reported that he was able to control his pain with medication and denied numbness, weakness, or buckling, but he affirmed "stiffness and pain with prolonged position holding of both the knee and the shoulder." (R. 794-95). Subsequent physical examination revealed that he had tenderness but no effusion or erythema. (R. 794-95). In his reports from 2008 to 2010, Dr. Carter repeatedly noted that Plaintiff was able to manage his pain with Arthrotec and Vicodin prescription. (R. 794-807). A left shoulder MRI taken in September 2009 showed a "Hill-Sachs deformity" with "[p]ost-surgical changes" and "[m]ild degenerative changes" but no evidence of any "recurrent tear." (R. 802-03).

From August 2010 to January 2011, Plaintiff reported relief after steroid injections to the left shoulder. (R. 807-08).  In April 2011, Plaintiff reported to Dr. Stephen Levinson increased knee pain due to repetitive activities such as walking but reported no loss of any significant function of his shoulder. (R. 1017-18).  In June 2011, Dr. Stephen Levinson's physical examination revealed pain but full range of motion on the left shoulder and mild tenderness in the right knee with full range of motion and crepitus. (R. 1015).

In December 2008, Dr. Carter noted on a standardized check-box form that Plaintiff was able to lift or carry between 5 and 10 pounds for up to 1/3 of an 8 hour work day and stand or walk for less than 2 hours and sit for less than 4 hours in an 8 hour work day. (R. 315).  He also opined that Plaintiff would be in pain during the work day, interfering with his ability to function, and that Plaintiff required frequent breaks and two or more sick days per month. (R. 316).

In September 2011, Dr. Marc Levinson noted on a standardized check-box form that Plaintiff was able to lift or carry between 5 and 10 pounds for up to 1/3 of an 8 hour work day and stand or walk for less than 1 hour and sit for less than 6 hours in an 8 hour work day. (R. 1011-12).  Dr. Marc Levinson also noted that Plaintiff would require frequent breaks, medication that would interfere with his ability to work, and 2 or more sick days each month. (R. 1012).

## B. Consulting Physicians

The SSA required Plaintiff to visit the following three consulting physicians over the course of his disability benefits application.

## 1. Dr. Justin Fernando

Dr. Fernando examined Plaintiff in April 2007.  He noted Plaintiff's medical history and pain complaints. (R. 281-84).  During a physical examination, Dr. Fernando found Plaintiff had

no acute distress and no trouble dressing or undressing, or getting on or off the examination table. (R. 282).  Plaintiff had normal gait and station, decreased range of motion of the left shoulder and right knee with 5/5 muscle strength and no atrophy, joint effusion or instability. (R. 282-83).  Neurological exam results were normal with no evidence of motor or sensory deficits. (R. 282-83).  X-rays of both left shoulder and right knee were unremarkable. (R. 283).  Dr. Fernando diagnosed Plaintiff's right knee with "[i]nternal derangement" and "osteoarthritis" and his left shoulder as injured and "[s]tatus post surgical repair of labrum and rotator cuff . . . ." (R. 283).  Dr. Fernando opined that Plaintiff had severe limitation reaching with his left arm and that it was "conceivable given the circumstances that he could be limited from prolonged standing." (R. 283-84).

**2.  Dr. Leena Philip**

Dr. Philip examined Plaintiff in July 2010. (R. 997-1001).  Dr. Philip noted Plaintiff's medical history and pain complaints. (R. 997-98).  Dr. Philip found Plaintiff had no acute distress and no trouble dressing or undressing or getting on or off the examination table. (R. 999).  Plaintiff had a normal gait but decreased range of motion of the left shoulder.  His right knee also had a decreased range of motion, but he had no swelling or effusion. (R. 999-1000). Plaintiff's head, eyes, nose, throat, neck, chest, spine, heart, lungs, abdomen, and extremities were normal. (R. 999).  Plaintiff had 5/5 strength in both upper and lower extremities and no sensory deficits. (R. 1000).  Dr. Philip diagnosed Plaintiff with "[l]eft shoulder pain," "[r]ight knee pain," "[h]ypertension," "[non-insulin]-dependent diabetes," "[i]ncreased triglycerides, by history," and "[a]cid reflux." (R. 1000).  Dr. Philip opined that Plaintiff had mild limitation in overhead reaching, pushing, and pulling and mild limitation in kneeling, squatting, climbing stairs, and prolonged standing. (R. 1000-01).

### 3. Dr. Suraj Malhotra

Dr. Malhotra examined Plaintiff in February 2011. (R. 878-87).  Dr. Malhotra noted Plaintiff's medical history and pain complaints. (R. 878).  Dr. Malhotra found Plaintiff had no acute distress and no trouble dressing or undressing or getting on or off the examination table. (R. 879).  Plaintiff had normal gait and station and decreased range of motion of the left shoulder with 5/5 strength. (R. 879-80).  Plaintiff also had mild limitation of the right knee with 5/5 strength. (R. 880).  Dr. Malhotra diagnosed Plaintiff with hypertension, "diabetes mellitus, by history," "[s]tatus post rotator cuff tear left shoulder with pain," and "[s]tatus post arthroscopy for meniscus tear right knee, remote, with pain." (R. 880).  Dr. Malhotra opined that Plaintiff had a minimal limitation in squatting, a moderate limitation in elevating the left arm above the shoulder level, and a mild limitation in bending the right knee. (R. 880).  Dr. Malhotra further opined that Plaintiff was able to lift 11 to 50 pounds between 1/3 to 2/3 of an 8 hour day; carry up to 20 pounds more than 2/3 of an 8 hour day; and stand or walk for 1 hour and sit for 8 hours per day. (R. 882-87).

### C. Plaintiff's Testimony during September 27, 2011 Hearing before ALJ Gonzalez

ALJ Gonzalez began the hearing by inquiring into Plaintiff's educational and vocational background. (R. 405-408, 425-26, 432-33).  The ALJ then asked Plaintiff about his current condition, pain management, and daily activities. (R. 411-19; 427-32, 433-35).  Plaintiff testified that he manages his pain well with prescribed Vicodin and testified that Vicodin causes him "[j]ust sleepiness . . . [and] just makes me take a little nap." (R. 412-13).  When the ALJ asked what time of the day Plaintiff takes a nap, Plaintiff responded that "[i]t depends," and "sometimes I'll take it at nighttime." (R. 427).  Plaintiff then changed his statement, saying that he "take[s] about two naps" per day. (R. 428).  With one Vicodin per day, Plaintiff testified that

he could carry or lift up to 10 pounds using his left arm and manage his pain fully up to 8 hours. (R. 413, 416, 427, 431). Plaintiff further testified that he spends most of his day on either the bed or recliner chair watching television or reading the newspaper. (R. 418-19, 430). He also testified that he does not take care of kids, does very little house chores, and does not engage in recreational activities or hobbies. (R. 418-19). Plaintiff testified that he is not "a big driver" but "can drive to the store" and "around the corner." (R. 429).

Plaintiff testified that he uses a knee brace to stabilize his right knee on a daily basis. (R. 412). He also stated that keeping his left arm to his side helps with his shoulder pain. (R. 429). However, Plaintiff testified that he uses his dominant left hand for engaging in simple daily activities, such as brushing his teeth and buttoning his shirts. (R. 430).

The ALJ also asked Plaintiff about his treatment history with various physicians. (Dr. Hyman & NP Orton: R. 409-11; Dr. Flatow: R. 423-24; Dr. Appel: R. 423-25; Dr. Levinson: R. 424). The ALJ inquired in detail about their specialties, treatment periods, and frequency and purpose of their care. Plaintiff testified that he saw Dr. Hyman and NP Orton most frequently. (R. 410). He also testified that Dr. Flatow is a surgeon who specializes in shoulders, (R. 423), that Dr. Appel is an orthopedic physician, and that Dr. Levinson specializes in pain management. (R. 424). Plaintiff added that, when his treating physicians were completing Plaintiff's standardized check-box assessment forms, the treating physicians only briefly asked him how long he could stand and sit for and that only one physician asked Plaintiff how much he could lift. (R. 420-421).

## II. STANDARD OF REVIEW

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard. The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in the original) (quotation marks and citations omitted). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted). Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted). On the other hand, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (alteration provided) (quotation marks and citation omitted).

A claimant is disabled and entitled to disability insurance benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine whether a claimant is eligible for SSI benefits on the basis of a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre*, 758 F.3d at 150 (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir.2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445 (alteration provided) (citation omitted).  The ALJ also has an affirmative obligation to develop the record due to the nonadversarial nature of the administrative proceeding. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir.2008) (citations omitted).  However, if "there are no obvious gaps in the administrative record, and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47).

### III.  THE ALJ'S DECISION

The ALJ applied the five-step approach in his October 21, 2011 decision. (R. 380-90). At the first step, the ALJ found that Plaintiff was not engaged in "substantial gainful activity during the period from his alleged onset date of October 30, 2006 through his date last insured of December 31, 2010." (R. 382).  At the second step, the ALJ determined that Plaintiff had severe impairments regarding his left shoulder and right knee. (R. 382).  At the third step, the ALJ determined that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in "20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 382).  At the fourth step, the ALJ determined that Plaintiff could not perform his past relevant work as a corrections officer, which required a medium level of exertion. (R. 388).

The ALJ then determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform

> sedentary work as defined in 20 C.F.R. [§] 404.1567(a) except he can lift and carry 10 pounds frequently and occasionally [and] can stand and walk for 2 hours and sit for 6 hours per 8 hour day.  He can occasionally reach overhead with his left upper extremity and can occasionally crouch, crawl, kneel and climb.  Due to problems with concentration, he is limited to unskilled work.

(R. 383).

The ALJ acknowledged that, pursuant to 20 C.F.R. § 416.927, treating physicians' opinions are generally given controlling weight. (R. 387).  However, the ALJ did not find three treating physicians' opinions—those of Dr. Levinson, Dr. Appel and Dr. Carter—persuasive, finding that they were inconsistent with substantial evidence in the record. (R. 387).  Further, the ALJ gave little weight to another treating physician, Dr. Hyman, because the ALJ concluded that this doctor's opinion was not well supported by objective medical evidence. (R. 387-88).  The ALJ gave little weight to NP Orton's opinion, who treated Plaintiff from 2005 to 2011, since she

is not a recognized medical source within the meaning of the SSA regulations and also because her opinion was not supported by substantial evidence. (R. 388). The ALJ gave little weight to Dr. Flatow's opinion, a physician who operated on Plaintiff, because his opinion was contradicted by Plaintiff's testimony at the hearing. (R. 388). Finally, ALJ Gonzalez gave Dr. Cuarta's opinion little weight since his evaluation was marked past the date last insured. (R. 388).

The ALJ also did not find Plaintiff's subjective complaint of "sharp, unrelenting" pain credible because Plaintiff testified that he was able to manage pain with Vicodin and that he could lift up to 10 pounds with medication. (R. 387).

Given his determination of Plaintiff's residual functioning capacity, the ALJ credited the vocational expert's ("VE") testimony that Plaintiff could find employment in the national economy. (R. 389). At the hearing, the VE testified that a hypothetical person with a residual functioning capacity like Plaintiff's would have been able to work as a call-out operator clerk (DOT # 237.367-046) with 85,000 positions in the national economy, a change account clerk (DOT # 205.367-014) with 32,900 positions in the national economy, and an addressor (DOT # 209.587-010) with 25,042 positions in the national economy. (R. 438-39). The ALJ determined that the VE's testimony was consistent with the information in the Dictionary of Occupational Titles. (R. 389). Because there were other jobs Plaintiff could have performed in the national economy, the ALJ determined that Plaintiff was "not disabled" as defined in the SSA regulations at any time from October 30, 2006 through December 31, 2010. (R. 390).

## IV. DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and erroneous as a matter of law. Specifically, Plaintiff maintains that the ALJ did not properly

apply the treating physician rule and that the ALJ improperly discounted Plaintiff's subjective pain complaints.

## A. The ALJ Properly Applied the Treating Physician Rule.

Plaintiff contends that the ALJ erred as a matter of law by discounting Plaintiff's treating physicians' opinions when determining his residual functioning capacity. (Docket No. 11 at 22-28).  Defendant responds that there is substantial evidence supporting the ALJ's decision not to give controlling weight to Plaintiff's treating physicians' opinions. (Docket No. 16 at 18-23).

## 1. The Treating Physician Rule

At step four in the disability analysis, the ALJ must determine the applicant's residual functioning capacity. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  It remains the applicant's burden, at this step, to establish that he is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).

In determining an applicant's residual functioning capacity, the ALJ must apply the treating physician rule, which requires the ALJ to afford controlling weight to the applicant's treating physician's opinion "when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).  Thus, "'[a] treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)). Moreover, if there is substantial evidence in the record that contradicts or questions the credibility of a treating physician's assessment, the ALJ may give that treating physician's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating physicians' opinions, as they were not supported by substantial

evidence in the record); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).

To discount the opinion of a treating physician, the ALJ must consider various factors and provide a "good reason." 20 C.F.R. § 404.1527(c)(2)-(6).  These factors include:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Second Circuit has made clear that ALJs need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701, 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases).  What is required, however, is that the ALJ provide "good reasons" when not affording controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at 407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'"). Finally, the Second Circuit has expressed doubt over treating physicians' check-box prognoses, reasoning that a "standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record." *Halloran*, 362 F.3d at 31 n. 2 (2d Cir. 2004).

**2. Analysis**

Plaintiff contends that the ALJ did not consider (1) the nature and extent of Plaintiff's treatment relationships with his doctors, (2) the supportability of the treating physicians' opinions, (3) the specialties of Plaintiff's treating physicians, or (4) the consistency of the opinions with the record as whole. (Docket No. 11 at 24-28). Plaintiff's arguments are unpersuasive. After reviewing the record as a whole, the ALJ considered the appropriate factors, and his decision is supported by substantial evidence.

First, the ALJ considered the nature and extent of Plaintiff's treatment relationships with each of his treating physicians, reviewing Plaintiff's medical history thoroughly and chronologically. (R. 384-88). Indeed, the ALJ documented the treating physicians' medical examination results and opinions by chronicling Plaintiff's doctor visits from 2005 to 2011. (R. 384-88). In his opinion, the ALJ listed the dates of specific visits with Plaintiff's treating physicians, the nature of each visit, and the physicians' prognoses. (R. 384-86). Further, the ALJ asked Plaintiff during the September 27, 2011 hearing about his doctors and inquired into the nature of various treatment relationships. (R. 409-11, 423-25). Moreover, the ALJ recognized that NP Orton, who appears to have treated Plaintiff most regularly, was not entitled to the deference reserved for treating physicians under 20 C.F.R. § 404.1502. Nonetheless, the ALJ did not discard NP Orton's notes and findings outright, instead granting her opinion "little weight." (R. 387-88). Thus, the ALJ properly considered the nature and extent of Plaintiff's treating physicians' treatment relationships.

Second, the ALJ properly considered whether the treating physicians' opinions were supported or unsupported by the medical evidence in the record. In finding Dr. Levinson's, Dr. Appel's, and Dr. Carter's opinions of total disability unpersuasive, for example, the ALJ

explained that the record indicated that Plaintiff had "a normal gait and station, good strength and elevation of the left shoulder, full 5/5 strength in both upper and lower extremities, normal sensation and pain at extremes only . . . ." (R. 387).  The ALJ further noted that Plaintiff had reported to these physicians "improvement with treatment" and "pain rates from 4-6 out of 10." (R. 387).  The ALJ also relied on medical documentation in which Plaintiff had reported good pain management with Vicodin and an improving condition with steroid injections and physical therapy. (R. 386-87, 806-08).  Plainly, the record contains substantial medical evidence that supports the ALJ's decision.  For example, on April 9, 2007, Dr. Appel noted that Plaintiff had a "5/5 graded muscle strength of the quadriceps, hamstring and gastrocnemius." (R. 280).  On June 30, 2011, Dr. Levinson noted that "[t]here is significant pain in [Plaintiff's] left shoulder with abduction; however, range of motion still remains preserved and full.  In the right knee, however, there is mild tenderness to palpation over the medial joint line" (R. 1015).  Dr. Levinson continued, "[t]he patient has marked crepitus with range of motion.  Range of motion, however, is full." (R. 1015).  Moreover, all three consultative physicians noted that Plaintiff's gait was normal, that he did not need help changing for his exams, and that he did not need help getting on or off the exam table. (R. 999 (Dr. Philip), 879 (Dr. Malhotra), 282 (Dr. Fernando)).  As such, the ALJ properly considered whether the treating physicians' opinions were supported by the evidence.

Third, contrary to Plaintiff's claim, the ALJ did, in fact, consider the specialties of Plaintiff's treating physicians.  For example, the ALJ plainly refers to Dr. Flatow as a "surgeon" in his written decision. (R. 384).  The ALJ also noted that Dr. Hyman's practice was at "Orthopedics & Sports Medicine," reflecting Dr. Hyman's specialty in orthopedics. (R. 384).  The ALJ further noted that Dr. Carter worked at "Downtown Physical Medicine and

Rehabilitation." (R. 385). Moreover, the ALJ discussed the specialties of Plaintiff's treating physicians during the September 27, 2011 hearing. (R. 423 (Dr. Flatow)); (R. 423, 425 (Dr. Appel)); (R. 424 (Dr. Levinson)).

Fourth, the inconsistencies among the treating physicians' opinions and the record further support the ALJ's decision not to defer to the treating physicians. On one hand, Plaintiff argues that the ALJ should have deferred to the check-box notation signed by NP Orton and Dr. Barry Hyman, dated December 19, 2008. That form indicates that, in an eight hour workday, Plaintiff could stand and walk for less than one hour, sit for less than two hours, and lift more than five but less than 10 pounds. (R. 324-25). On the other hand, however, the ALJ recognized that this opinion—shared, in part, by other treating physicians in similar check-box forms—was inconsistent with "[m]ultiple examinations by these practitioners[, which] showed [Plaintiff] with a normal gait and station" and "good strength" in his left shoulder. (R. 388). Moreover, the Court notes that Plaintiff's reliance on these check-box prognoses is not tremendously persuasive, given the Second Circuit's instruction that these forms are "only marginally useful for purposes of creating a meaningful and reviewable factual record." *Halloran*, 362 F.3d at 31 n. 2. Furthermore, Dr. Malhotra, a consultative physician, opined that Plaintiff could lift 11 to 50 pounds frequently, carry up to 20 pounds continuously, and stand or walk for 1 hour and sit for 8 hours per day. (R. 882-87). Finally, the treating physicians' opinions that Plaintiff was totally disabled due to constant and extreme pain are further contradicted by Plaintiff's own testimony at the ALJ hearing, where Plaintiff testified that he was able to manage his pain well with Vicodin and that he could lift 10 pounds with his left arm under medication. (R. 413, 416).

In short, the ALJ's determination of Plaintiff's residual functioning capacity is supported by substantial evidence in the record. As such, Plaintiff's contentions are without merit, and the ALJ's findings are deemed conclusive.

## B. The ALJ's Credibility Assessment is Supported by Substantial Evidence.

Plaintiff contends that the ALJ improperly discounted Plaintiff's subjective pain complaints. (Docket No. 11 at 31-34). Defendant responds that the ALJ properly considered Plaintiff's testimony when assessing his credibility. (Docket No. 16 at 24-25).

In the disability analysis, the ALJ has a duty to "take into account a claimant's subjective claims regarding his limitations." *Adamik v. Astrue*, No. 07 Civ. 10283, 2009 WL 6337910, at *17 (S.D.N.Y. Aug. 3, 2009) (citing 20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d)). In assessing Plaintiff's subjective pain level, "the ALJ is not required to blindly accept the subjective testimony of a claimant." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 220 (N.D.N.Y. 2009) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). "Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain." *Pardee*, 631 F. Supp. 2d at 220 (citing *Mimms v. Heckler,* 750 F.2d 180, 185–86 (2d Cir.1984)). "It is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (citing *Perales*, 402 U.S. at 399). The ALJ is required to consider Plaintiff's work history; however, it is one of many factors to be considered in the credibility assessment. *Schaal*, 134 F.3d at 502. Also, the fact that Plaintiff suffers from pain "does not automatically qualify [him] as disabled, since 'disability requires more than mere inability to work without pain.'" *Pardee*, 631 F. Supp. 2d at 221 (citing *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir. 1983)).

Plaintiff first contends that he cannot work due to constant sharp, shooting pain. (Docket No. 11 at 32). However, as the ALJ recognized, Plaintiff repeatedly reported to Dr. Carter—one of Plaintiff's treating physicians—that his shoulder and knee conditions were improving with steroid injection treatments. (R. 807-09). Plaintiff also told Dr. Carter on multiple occasions, (R. 178, 792-808, 970-79), and the ALJ at the September 27, 2011 hearing, (R. 413, 427, 430), that he was able to control his pain successfully up to eight hours with one dose of Vicodin per day. As such, Plaintiff concedes that constant pain alone does not make him disabled. (Docket No. 11 at 32). Instead, he argues that the real problem is the side effect of his pain medication that makes him take two naps during the day. (Docket No. 11 at 32).

However, there is substantial evidence to rebut Plaintiff's claim that he requires two daily naps. At the September 27, 2011 hearing, Plaintiff first testified that Vicodin causes him "[j]ust sleepiness . . . [and] just makes me take *a little* nap." (R. 412-13) (emphasis added). When the ALJ asked what time of the day Plaintiff takes a nap, Plaintiff responded: "[i]t depends . . . when I'm in a lot of pain[,] I'll just take it -- sometimes I'll take it at nighttime." (R. 427). Shortly after this exchange, upon questioning by his attorney, Plaintiff changed his statement, testifying that he "take[s] about two naps" per day. (R. 428). Put simply, Plaintiff's inconsistent statements provide substantial evidence to question his credibility. Moreover, the medical record does not corroborate Plaintiff's claim that Vicodin makes him so sleepy that he requires two naps per day. For example, the medical record does not contain any reference to Plaintiff having side effects from Vicodin, although he listed in detail his other symptoms such as his pain level, his inability to sleep due to shoulder pain, and the effectiveness of the steroid injections and physical therapy. (R. 792-870, 969-96, 1011-50).

Furthermore, Plaintiff's inconsistent testimony gave the ALJ reason to question Plaintiff's credibility. For example, although Plaintiff testified that he does not use his left arm, (R. 428), he also testified that he could lift up to 10 pounds using his left arm when taking Vicodin. (R. 416, 418).

Plaintiff further claims that the ALJ erred in failing to consider Plaintiff's work history. (Docket No. 11 at 33). However, as the hearing transcript plainly shows, the ALJ inquired about Plaintiff's 19-year work history as a corrections officer. (R. 405-08). Moreover, the ALJ did not discredit Plaintiff's testimony in whole, as he agreed, for example, that Plaintiff could not perform his past relevant work as a corrections officer. (R. 388). The ALJ also took Plaintiff's limited concentration and limited use of his dominant arm into account when assessing Plaintiff's residual functioning capacity. (R. 439).

In sum, the ALJ's credibility assessment is supported by substantial evidence. Accordingly, the ALJ's decision should be affirmed.

## V. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's cross-motion for judgment on the pleadings should be granted and the case be dismissed. Plaintiff's motion should be denied.

## VI. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Objections and responses to objections, if any, shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Honorable Kenneth M. Karas and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).


Dated:   May 5, 2015
         White Plains, New York

                              **RESPECTFULLY SUBMITTED,**


                              JUDITH C. McCARTHY
                              United States Magistrate Judge